UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER JAMES BAILEY,

    Plaintiff,

v.

    Case No. 12-10281

    Honorable Nancy G. Edmunds

SCOUTWARE LLC and KATHLEEN
CRONIN, individually,

    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

This matter comes before the Court on Defendants Scoutware LLC and Kathleen Cronin's motion to dismiss. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

**I.    Facts**

On July 11, 2011, Plaintiff Christopher Bailey began working as a sales representative for Defendant Scoutware. (Compl. ¶¶ 4, 11.) Plaintiff was hired by Jeff Murphy, who Plaintiff believes is the majority shareholder and CEO of Defendant Scoutware. (Compl. ¶ 10.) Plaintiff received a formal offer, stating, "Scoutware, LLC is pleased to formally extend to you anoffer of full-time employment, working as a Sales Representative, reporting to Kate Cronin." (Compl. Ex. 1.) Plaintiff signed a written

1

contract, which had a two year non-compete clause and a termination clause that required two weeks notice. (Compl. ¶ 12.)

On October 17, 2011, Plaintiff handed over a copy of his employment contract with Defendant to Fast Model Technologies LLC, in compliance with a discovery request because Plaintiff had filed a lawsuit against Fast Model, his former employer. (Compl. ¶ 22.) On November 4, 2011, less than three weeks later, Jeff Murphy called Plaintiff and told him the check for the pay period ending October 31, 2011 would be his last check because he was being terminated effective immediately. (Compl. ¶ 23.) Murphy asked Plaintiff why he had not informed Defendant that he was suing his former employer. (Compl. ¶ 25.) Murphy further stated that he had learned things about Plaintiff that did not fit the type of employee the company wanted, but Murphy would not say where or how he learned these things. (Compl. ¶¶ 26-27.) Murphy also said that Plaintiff was not performing as expected. (Compl. ¶ 28.) This was the first time Plaintiff's work performance had ever been questioned and when Plaintiff asked why no one had expressed Plaintiff's unsatisfactory work performance before this, Murphy did not respond. (Compl. ¶¶ 29-30.)

Plaintiff attempted to contact Murphy several times to get clarification and learn who had told Murphy about Plaintiff's lawsuit against Fast Model, but Murphy refused to respond. (Compl. ¶ 34.) Defendant did not pay Plaintiff for wages owed to Plaintiff for the period of November 1, 2011 through November 4, 2011 and for the two weeks "termination period" following November 4, 2011, as required by Plaintiff's employment contract. (Compl. ¶ 36.) Plaintiff's employment contract specifically states:

> TERM OF AGREEMENT/EMPLOYMENT. SCOUTWARE hereby employs Employee as an at-will employee of SCOUTWARE under the terms of the Agreement. The initial term of Employee's employment under the Agreement shall commence as of July 11, 2011 and shall continue until terminated by either party (the "Employment Period").
>
> * * *
>
> 10. TERMINATION/SEVERANCE/EXTENSION.
> A. Termination: Either party may terminate the Agreement in advance by giving the other party fourteen (14) days' prior written notice. SCOUTWARE may terminate the Agreement immediately at any time for cause.
> Immediately upon notice of termination by either party, Employee shall cease all services for SCOUTWARE, and shall cease all relations with SCOUTWARE and with all SCOUTWARE employees, agents, contractors, representatives, customers and others related to the business or matters of SCOUTWARE.

(Compl. Ex. 1.) Despite Plaintiff's request, Defendant Scoutware refused release him from the two-year non-compete clause. (Compl. ¶¶ 37-38).

On December 13, 2011, in a deposition in Plaintiff's case against Fast Model, Ross Comerford, a Fast Model employee, admitted that he spoke to Defendant Cronin, a sales representative at Defendant Scoutware and that "Plaintiff's employment with Fast Model came up in conversation." (Compl. ¶¶ 39-40.) After subpoenaing phone records, Plaintiff found that on October 19, 2011, two days after Plaintiff turned over his employment contract to Fast Model's attorney, Ross Comerford attempted to call Defendant Cronin four times in four minutes, and when Defendant Cronin called Comerford back, they spoke for more than twelve minutes. (Compl. ¶ 46.) Before these calls, Comerford and Defendant Cronin had not spoken in seven months.

Immediately after hanging up with Comerford, Defendant Cronin called the executive vice president of Defendant Scoutware and Jeff Murphy. (Compl. ¶¶ 47-48.) On November 3, 2011, the day before Plaintiff was terminated, Defendant Cronin and Murphy had a 45-minute phone conversation and exchanged eight texts. (Compl. ¶¶

50-51.) On November 4, 2011, less than two minutes after Murphy called and terminated Plaintiff, Murphy texted Defendant Cronin. (Compl. ¶ 53.)

On December 3, 2011, Plaintiff's attorney notified Fast Model's attorney that Defendant Scoutware had terminated Plaintiff's employment and expressed concern that Plaintiff was terminated very close in time to when Plaintiff had given Fast Model his employment contract. (Compl. ¶ 54.) On December 5, 2011, two days later, Comerford called Defendant Cronin and spoke to her for twenty minutes and they exchanged four texts. (Compl. ¶ 55.) On December 13, 2011, Comerford, in his deposition, stated:

> Q: And in talking to [Cronin], did you discuss [Plaintiff's] employment [with Defendant]?
> A. No.
> Q. You had no conversation with her whatsoever?
> A. She asked me – she said that we have hired a former one of your employees. At the time, I said, who would that be? She said, [Plaintiff]. She said, why – what happened? Why did he leave your company? I said, I'm not at liberty to discuss that at this time, and I left it at that.
> * * *
> Q. And it's your testimony here today that you had absolutely nothing to do with [Plaintiff's] termination?
> A. Absolutely not. Nothing to do with his termination.

(Compl. Ex. 3.)

On January 21, 2012, Plaintiff filed his four-count Complaint, alleging: (1) retaliatory discharge under the Michigan Whistleblowers' Protection Act (the "WPA") (against Scoutware); (2) breach of contract (against Scoutware); (3) a declaration that the contractual non-compete provision is unenforceable (against Scoutware); and (4) tortious interference with a contract (against Cronin).

On March 27, 2012, Defendants filed this motion to dismiss pursuant to Rule

4

12(b)(1), (2) and (6) for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to plausibly state a claim upon which relief can be granted. Plaintiff's response was due on April 17, 2012. Plaintiff did not submit his response until May 18, 2012.

## II.     Analysis

### A.     12(b)(1): Subject Matter Jurisdiction

#### 1.     Standard

Subject matter jurisdiction is governed by Fed. R. Civ. P. 12(b)(1). A motion to dismiss pursuant to Rule 12(b)(1) may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). When a defendant challenges subject matter jurisdiction on a factual basis, the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). "In reviewing a 12(b)(1) motion, the Court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (citation omitted).

#### 2.     Analysis

Defendant argues that Plaintiff failed to properly allege that this Court has subject matter jurisdiction on the basis of diversity of citizenship. In the Jurisdictional Claims of the Complaint, it states:

> 1. Plaintiff, at all times, has been a resident of Livingston County, State of Michigan.
> 2. Defendant Scoutware LLC is an Illinois Limited Liability Company whose address is 954 W. Washington Blvd., 6th Floor, Suite NW, Chicago, IL 60607.

      3.    Defendant Kathleen (Kate) Cronin, an employee of Scoutware, is a resident of the State of Illinois whose address is 2300 W. Monroe St., Apt 1, Chicago, IL 60612.

Defendant argues that Plaintiff was required to allege that he was a *citizen* of Michigan and that the Defendants were *citizens* of Illinois, not merely that they were residents of those states or that Defendant Scoutware was an Illinois LLC with an Illinois address.

On June 8, 2012, this Court ordered Plaintiff to file a responsive pleading to allege that there was diversity of citizenship among the parties in order to move forward in this Court. On June 13, 2012, Plaintiff responded and properly alleged diversity of citizenship. This cured the defect in Plaintiffs' Complaint. *See Sun Printing & Publishing Ass'n v. Edwards*, 194 U.S. 377, 382 (1904) ("The whole record, however, may be looked to, for the purpose of curing a defective averment of citizenship, where jurisdiction in a Federal court is asserted to depend upon diversity of citizenship, and if the requisite citizenship is anywhere expressly averred in the record, or facts are therein stated which, in legal intendment, constitute such allegation, that is sufficient.").

Defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED.

    **B.**    **12(b)(6): Failure to State a Claim**

        **1.**    **Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To survive a Rule

12(b)(6) motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

"[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

> Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

*Id.* (internal quotation marks and citation omitted). Thus:

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at

1949 (internal quotation marks and citation omitted).

### 2. Analysis

Defendants argue that Plaintiff has failed to state a claim for relief under the Whistleblower Protection Act or for tortious interference with a contract against Defendant Cronin.

#### i. Whistleblowers' Protection Act

Under the Whistleblowers' Protection Act ("WPA"):

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state . . . .

Mich. Comp. Laws § 15.362. To state a prima facie case of retaliation under the WPA, a plaintiff must show: (1) he was engaged in protected activity as defined by the act; (2) he was discharged or discriminated against; and (3) a causal connection exists between the protected activity and the discharge or adverse employment action. *West v. Gen. Motors Corp.*, 655 N.W.2d 468, 471-72 (Mich. 2003). A burden-shifting analysis applies to claims brought pursuant to the WPA.

> It is a burden of proof analysis. Under it, plaintiff has the burden of proving that he was engaged in protected conduct and that his participation in that conduct was a motivating factor in the decision to terminate him. The burden then shifts to the employer to come forward with evidence demonstrating that plaintiff's termination was for a legitimate reason. If the employer states a legitimate reason, the employee may still prevail if he demonstrates that the reason was mere pretext for his dismissal.

*Eckstein v. Kuhn*, 408 N.W.2d. 131, 134 (Mich. Ct. App. 1987).

Under the WPA, protected activity is when the "employee . . . reports . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state." In this case, the protected activity is that Plaintiff reported his former employer's violation of law and filed a lawsuit to correct those violations. Defendant argues, however, that Plaintiff has failed show a causal connection between his protected action and his termination. Defendant states that Plaintiff's sole factual support is his timeline of events and phone calls and that this shows nothing more than that Plaintiff's termination came after the protected action, not because of it.

On October 19, 2011, two days after Plaintiff turned over his employment contract to Fast Model's attorney, Ross Comerford attempted to call Defendant Cronin four times in four minutes, and when Defendant Cronin called Comerford back, they spoke for more than twelve minutes. Before that day, Comerfold and Defendant Cronin had not exchanged a phone call or text message in seven months. Immediately after hanging up with Comerford, Defendant Cronin called the executive vice president of Defendant Scoutware and Jeff Murphy. On November 3, 2011, the day before Plaintiff was terminated, Cronin and Murphy had a 45-minute phone conversation and exchanged eight texts. On November 4, 2011, Murphy fired Plaintiff over the phone.

In the phone conversation, Murphy asked Plaintiff why he did not inform Murphy that he was suing his former employer. Murphy also stated that he had learned things about Plaintiff that did not fit the type of employee Defendant Scoutware wanted. Plaintiff asked Murphy about how Murphy came to have this information but Murphy refused to answer. After asking about the lawsuit, Murphy went on to say that Plaintiff was not performing as expected, but this was the first time Plaintiff's work performance

9

had ever been questioned. When Plaintiff asked Murphy why no one had expressed Plaintiff's alleged unsatisfactory work performance, Murphy did not respond.

This Court finds Plaintiff's timeline, in conjunction with his other allegations, persuasive. The fact that Murphy brought up Plaintiff's lawsuit and questioned why he had not told anyone he was suing his former employer when Murphy called to terminate Plaintiff, along with the timing and frequency of the phone calls between Comerford, Defendant Cronin, and Murphy, indicates causation.

Plaintiff attached an email he sent to Jeff Murphy about a week after he was terminated that states, in relevant part:

> I'm still in a little shock and confused regarding the actual reasons and, if the reasons you mentioned are in fact the reasons, I certainly wish they would have been brought to my attention so I could have corrected them. I was a little distracted with some personal things over the last few weeks so I was trying to focus on my contacts and was attempting to build my group email lists in C2 so I could start doing weekly campaigns that I've had success with before. I realize now how it may have come across that I wasn't communicating with the other reps, however anytime anyone asked me to do something or help out I did. . . . I think with a little more time I could have produced the results I have shown in the past.
>
> * * *
>
> Finally, the odd timing of you letting me go has brought forth some questions I have about whether my former employer contacted you or anyone else at Scoutware. When my previous employer let go of myself and the other sales reps, they refused to pay us according to our contracts, including for me; a lot of commissions and valuable intellectual property I contributed to and other tasks I wasn't paid for. Without getting too much into it, we attempted to resolve it with them but they refused so I was sadly forced to file a lawsuit in Federal Court. As per discovery they asked for any new employment contracts I had signed since leaving them and we turned over the Scoutware contract approximately one month ago. I would certainly hope that my former employer and their lawyer would be smart enough to know they have no legal right to contact anyone associated with Scoutware and mention anything regarding me but my lawyer and I want to be certain they did not contact you, Kate, or anyone else upon learning I worked for Scoutware. We are currently debating whether we would need to bring this to the attention of our judge to see if we need to subpoena their communication records and see if they

contacted anyone with Scoutware. I'm hoping you can call me so I can be sure this didn't happen. I want to clarify that in no way am I accusing anyone with Scoutware of any wrongdoing but rather want to be sure my previous employer didn't interfere with my contract.

(Compl. Ex. 2.)

In this email, Plaintiff identifies that he is confused about the actual reasons he was terminated and questions whether someone at his old employer reached out to people at Scoutware.  Plaintiff wrote this email before he had access to the phone records that confirmed his suspicions that someone at Fast Model had called Scoutware.  Defendants argue that this email shows that Plaintiff was terminated for legitimate reasons having nothing to do with his pending lawsuit.

At this point in the litigation, Plaintiff need only state a plausible claim for relief and this Court must accept all the allegations in the Complaint as true.  Plaintiff has adequately shown a prima facie case, including causation.  Additionally, Plaintiff has alleged enough facts, with his phone conversation with Jeff Murphy, the timeline of phone calls and text messages, and his early-on suspicious that his termination was motivated by his protected activity–the lawsuit against his former employer–to allege that Defendants' "legitimate reason" for terminating Plaintiff was pretext and withstand a motion to dismiss.

Defendants also argue that the main purpose of the WPA is to "alleviate the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large business" by overcoming "fear of retribution," prohibiting "employer reprisals against whistleblowing employees for the purpose of encouraging employees to report violations." *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 455 Mich. 604

(1997) (internal citations and quotations omitted). "The primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, and not personal vindictiveness." *Id.* at 579. There is "no evidence which suggests that the Michigan Legislature intended the Whistleblowers Act to be used as an offensive weapon by disgruntled employees." *Id.*

Defendants argue that Plaintiff's protected act, filing the Fast Model Litigation, was merely a suit against his former employer for Plaintiff's own personal financial gain. Defendants argue that this is of no public concern and that there is no evidence that it was intended to provide any public benefit.

Defendants' reliance on *Shallal* is misplaced. In *Shallal*, the court determined that the plaintiff was using the WPA as a shield against being fired where she knew she was going to be fired before threatening to report her supervisor. The court determined that the plaintiff was effectively extorting her employer by threatening to report alleged violations a year later, in an effort to gain leverage and job security.

These facts are completely dissimilar from the current case, where Plaintiff had appropriately reported a violation of his former employer and had not even told his new employer about it, let alone tried to use it as leverage or to extort anyone. There is nothing in the language of the WPA that the protected activity must be a matter of public concern in the way that Defendants are attempting to argue. Further, reporting actual violations to help aggrieved parties and bring light to the violations so that they do not continue to occur is a matter of public concern. The subject matter of the action need not be a public safety issue or something deserving national attention.

Defendants' motion to dismiss Plaintiff's WPA claim for failure to state a claim is

DENIED.

### ii. Tortious Interference

To prevail on a claim for tortious interference with a contract under Michigan Law, a plaintiff must allege: "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848-49 (Mich. Ct. App. 2005). To show an unjustified instigation of the breach by the defendant, the plaintiff "must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l., Inc. v. Intermet Int'l. Corp.* 649 N.W.2d 808, 812 (Mich. Ct. App. 2002). If the "defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id.*

A claim for tortious interference with contract cannot be brought against a party to the contract or an agent of a party to the contract. *See Reed v. Mich. Metro Girl Scout Council*, 506 N.W.2d 231, 233 (1993). Employees of a contracting party are agents of that party and, therefore, not "third-parties" for purposes of a tortious interference with a contract claim. *Id.* An agent of a corporation may be held liable only when the agent's actions were purely for personal gain and with no benefit to the corporation. *Id.*

In this case, Plaintiff alleges a tortious interference claim against Defendant Cronin, who was Plaintiff's supervisor at Scoutware. Because Defendant Cronin was a Scoutware employee, in order to bring a claim for tortious interference, Plaintiff must

13

allege that her actions were purely for personal gain and with no benefit to the corporation. Plaintiff has failed to do this.

In his Complaint, Plaintiff alleges that Defendant Cronin acted unethically and improperly in going directly to "Andy Clark and Jeff Murphy of Defendant Scoutware LLC after speaking with Ross Comerford for the purpose of invading the contractual rights of Plaintiff." Nowhere in the Complaint, however, does Plaintiff suggest that Defendant Cronin had any personal motives for doing this. In his Response brief, Plaintiff states that Defendant Cronin is no longer working for Defendant Scoutware and "her multiple communications with Ross Comerford leaves the question of whether she was compensated for her actions by Mr. Comerford or promised some sort of employment at the conclusion of these cases with his company." Plaintiff argues that it is premature to dismiss Defendant Cronin without Plaintiff finding out whether her interference with Plaintiff's contract was self-serving because she was leaving the company. Defendant Cronin signed a declaration stating that at all times during the term of Plaintiff's employment with Defendant Scoutware, from July 11, 2011 to November 4, 2011, she was employed by Defendant Scoutware. (Defs. Mot. Ex. E.)

Plaintiff has not alleged any facts that suggest that Defendant Cronin was acting for personal gain with no benefit to the company. In order to withstand a motion to dismiss, Plaintiff must allege sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Plaintiff has failed to do this here.

Defendants' motion to dismiss the tortious interference claim against Defendant Cronin is GRANTED.

**C.     12(b)(2): Personal Jurisdiction**

14

Because Plaintiff failed to state a tortious interference claim against Defendant Cronin, Defendants' personal jurisdiction argument is moot. Plaintiff's remaining claims are alleged only against Defendant Scoutware.

### D.     Declaratory Judgment

Plaintiff seeks declaratory judgment on the enforceability and legality of the two-year non-compete clause in the employment contract he entered into with Defendant Scoutware. Defendant argues that Plaintiff's claim should be dismissed because it is not ripe.

> In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Federal courts' constitutional authority extends only to actual cases or controversies. *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).

To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision; otherwise the case is moot. *Id.* The requirements of case or controversy are no less strict under the Declaratory Judgment Act than in any other suits. *Alvatar v. Freeman*, 319 U.S. 359, 363 (1945). The Supreme Court established that in order to be ripe for adjudication, "it must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

The Sixth Circuit has held that there is no doubt that "where there is controversy as to the meaning and effect of a written contract interpretation may be sought from and made by the declaratory judgment of a court having jurisdiction over the parties." *Panhandle E. Pipe Line Co. v. Michigan Consol. Gas Co.*, 177 F.2d 942 (6th Cir. 1949). A court, in deciding whether declaratory judgment is appropriate, should consider:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Stockton v. Gen. Accident Ins. Co.*, No. 89-5492, 1990 WL 20477, at *4 (6th Cir. March 6, 1990).

Plaintiff alleges that an actual controversy exists regarding the enforceability and legality of the non-compete clause in Plaintiff's employment contract with Defendant. In the Complaint, Plaintiff alleges that he will be severely limited in seeking employment if the non-compete is not set aside and in his Response Brief, Plaintiff states that he has, in fact, reached out to competing companies seeking a job since his termination and his "ability to obtain employment has been severely compromised by this non-compete agreement, and he is currently still unemployed." (Pl. Resp. 12.)

Defendants argue that Plaintiff is inappropriately seeking an advisory opinion from this Court and that Plaintiff presents no actual controversy for this Court to resolve and has no injury that would be redressed by a favorable opinion. The non-compete

16

clause at issue, effective for two years following the termination date, is not set to expire until November 4, 2013.

At the motion to dismiss stage of this litigation, this Court finds that it is premature to dismiss Plaintiff's claim for declaratory judgment. This is particularly true where Plaintiff has alleged that this provision is preventing him from finding employment and Defendant Scoutware holds the position that it still has a contractual right based on the noncompete clause. Declaratory judgment in this case would serve a useful purpose in clarifying the legal relations in issue and it is not being used for the purpose of procedural fencing or to race to res judicata, as there are no other actions pending between the parties. Additionally, the use of a declaratory action will not increase friction between federal and state courts.

Defendants' motion to dismiss the declaratory judgment count is DENIED.[1]

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion is GRANTED as to the tortious interference claim against Defendant Cronin and DENIED as to the counts against Defendant Scoutware.

                              s/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated: July 9, 2012

---

[1] Plaintiff argues that declaratory judgment on this issue is ripe under permissive joinder, pursuant to Rule 18. The rules of joinder are irrelevant to the issue of ripeness.

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 9, 2012, by electronic and/or ordinary mail.

                                s/Carol A. Hemeyer
                                Case Manager