UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Christopher James Bailey,

        Plaintiff,

v.

Scoutware, LLC,

        Defendant.

_____/

Case No. 12-10281

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [75]

Before the Court is Defendant Scoutware, LLC's motion for summary judgment on Plaintiff Christopher Bailey's Whistleblower Protection Act, Mich. Comp. Laws §15.361 et seq., and breach of contracts claims.[1]  (Dkt. 75.)

Because the Court finds that Plaintiff has created issues of fact as to whether Defendant terminated him, at least in part, for his lawsuit against his former employer, and whether Defendant breached its employment agreement with Plaintiff when it did not give him two weeks' notice, the Court DENIES Defendant's motion  for summary judgment.

## I.    Facts

In this case, Plaintiff alleges that Scoutware terminated him and breached its contract with him when it found out about a suit Plaintiff filed against his former employer, Fast

---

[1]Scoutware is in the business of selling software to athletic departments at colleges and universities.  The colleges and universities use the software to contact prospective sport recruits.

Model.[2]  Below, the Court reviews Scoutware and Plaintiff's relationship, Plaintiff's alleged duties and the expectations of him at Scoutware, and how and when Scoutware allegedly learned about Plaintiff's Fast Model suit.  The Court also reviews the facts surrounding a New Orleans trip that Plaintiff and several Scoutware representatives went on, during which Scoutware argues that Plaintiff exhibited inappropriate behavior.  The Court then addresses Plaintiff's termination and various post-termination facts.

### A. Scoutware hires Plaintiff as a sales representative, the Scoutware agreement

On July 11, 2011, Plaintiff began working as a sales representative for Defendant Scoutware.  (Compl. ¶¶ 4, 11.)  Plaintiff received a formal offer, stating, "Scoutware, LLC is pleased to formally extend to you an offer of full-time employment, working as a Sales Representative, reporting to Kate Cronin."  (Compl. Ex. 1.)  Plaintiff signed a written contract, which had a two year non-compete clause and a termination clause that required two weeks' notice for either party to terminate the contract.  (Compl. ¶ 12.)  The Scoutware agreement provisions at issue in this case are:

> TERM OF AGREEMENT/EMPLOYMENT. SCOUTWARE hereby employs Employee as an at-will employee of SCOUTWARE under the terms of the Agreement. The initial term of Employee's employment under the Agreement shall commence as of July 11, 2011 and shall continue until terminated by either party (the "Employment Period").

> * * *

---

[2] In his Fast Model suit, Plaintiff alleged that his former employer Fast Model violated the Michigan Sales Representative Commissions Act, Michigan's procuring cause doctrine for post-termination commissions, promissory estoppel, breach of contract and quantum meruit, tortious interference against Fast Model and Ross Comerford, an employee, and intentional infliction of emotional distress against Fast Model and Ross Comerford.  (Dkt. 12, Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. 3.)

> 10. TERMINATION/SEVERANCE/EXTENSION.
> A. Termination: Either party may terminate the Agreement in advance by giving the other party fourteen (14) days' prior written notice. SCOUTWARE may terminate the Agreement immediately at any time for cause.
> Immediately upon notice of termination by either party, Employee shall cease all services for SCOUTWARE, and shall cease all relations with SCOUTWARE and with all SCOUTWARE employees, agents, contractors, representatives, customers and others related to the business or matters of SCOUTWARE.

Scoutware agreement (Pl.'s Resp., Ex. 1, Agreement.)

Jeff Murphy, Scoutware's president, states that Plaintiff approached Scoutware and represented that he was an experienced sales person in the sports recruiting industry, with established contacts, "who would work extremely hard and need very little supervision." (Pl.'s Resp., Ex. 28, Murphy Decl. ¶ 5.)  Murphy adds that he made the decision, on behalf of Scoutware, to hire Plaintiff.  (*Id.* ¶ 4.)

The agreement does not define or list what constitutes "cause."  Murphy testified that the agreement does not contain an exhaustive list of what "cause" was under the contract. (Pl.'s Resp., Ex. 2, Murphy Dep. at 8.)  He explained that "cause" depended upon the situation.  (*Id.* at 9.)  When questioned, he was unable to give an example of what could constitute cause for termination.  (*Id.*)  Murphy did acknowledge that Scoutware had terminated one other employee "for cause" and that employee demonstrated inappropriate behavior at work and intimidated another employee.  (*Id.* at 10.)

### B. Plaintiff's performance at Scoutware and Scoutware's allegations relating to Plaintiff underperforming

The expectations that Defendant had of Plaintiff, as well as Plaintiff's performance, are in dispute.  Generally, at Scoutware, Plaintiff's job was to contact college and university sports directors and administrators and persuade them to buy the Scoutware software.

3

There is a dispute as to how many calls per day Scoutware told Plaintiff to make as well as how many emails Plaintiff was supposed to send through Scoutware's email system, Contact2, as well as how many demonstrations that Plaintiff was supposed to conduct.

Andy Clark was Scoutware's Executive Vice President, at the relevant times. (Def.'s Mot., Ex. C, Clark Decl. ¶ 2.) His duties included overseeing sales and marketing. (*Id.* ¶ 3.)

Clark recounts his initial conversations with Plaintiff. Clark says that Plaintiff represented himself as a seasoned, experienced sales representative in the sports recruiting industry, and that "he was a self-starter who required very little supervision." (Clark Decl. ¶ 8.)

When Plaintiff visited the main Scoutware office in Chicago, in July, 2011, Clark states that he conveyed Scoutware's procedures and expectations, as well as Plaintiff's responsibilities and focus, to Plaintiff. (Clark Decl. ¶ 15.) Clark also states that he told Plaintiff that he should focus on reaching out to contacts and potential customers to set up demonstrations. (*Id.* ¶ 16.) Clark maintains that he explained Scoutware's sales process in detail and gave Plaintiff several examples of sales email, proposals, and presentations. (*Id.* ¶¶ 18, 19.) Clark states that Plaintiff received individual training on Contact2 from one of Scoutware's client services staff. (*Id.* ¶ 20.) Also during that July trip, Clark states that Plaintiff sat in on "various client training demonstrations and sales demonstrations." (*Id.* ¶ 21.)

Clark stated that he expected Plaintiff to make a minimum of 50 to 60 calls "per day." (Clark Dep. at 14, 27.) He explained that the 50 to 60 calls per day would lead to a corollary number of emails per week and 17 to 20 demonstrations per week. (*Id.* at 14.)

4

Scoutware appeared to have a tiered progression of responsibilities for its new employees, that is, Scoutware would first allow an employee to make calls, and then attend demonstrations of its product with more seasoned employees, and then, finally, an employee could conduct a demonstration by himself.

While Plaintiff was at Scoutware, Kate Cronin was the Director of Sales.  (Pl.'s Resp., Ex. 53, Decl. ¶ 2.)  Her duties included bringing in new business, maintaining existing business, and assisting with marking and training.  (*Id.*)  Cronin states that she worked alongside Plaintiff at Scoutware; she worked with him as a mentor.  (Pl.'s Resp., Ex. 53, Cronin Decl. ¶ 3.)

In early August, 2011, Defendant permitted Plaintiff to contact potential customers by phone.  (Pl.'s Resp. Ex. 42, Pl.'s Aff. ¶ 2.)  On August 19, 2011, Plaintiff states that Cronin told him to bear with Defendant as he was learning the company's practices because there was not a manual for new employees and the process was a "learn as you go" one.  (*Id.* ¶ 3, citing Pl.'s Ex. 45.)

Despite allegations to the contrary, Plaintiff affirms that Cronin praised his work and contributions to the company "multiple times."  (Pl.'s Aff. ¶ 4, citing Pl.'s Ex. 46.)

On August 19, 2011, Cronin told Plaintiff to make sure that he sent most of his email through Contact2.  (Pl.'s Resp., Ex. 37.)  She said to do so because Plaintiff would then be showing potential clients how "great" Scoutware email can look.  (*Id.*)  She informed Plaintiff that Andy Clark went through Contact2 daily "just to see who we're talking to and who we're emailing."  (*Id.*)  She also told Plaintiff that Clark "jumps" on employees for not sending enough emails through Contact2 and also not using proper grammar.  (*Id.*)  She offered her assistance to Plaintiff and gave him several other tips as well.  (*Id.*)

Plaintiff alleges that, in late August, 2011, Andy Clark told him that he needed Plaintiff to submit daily call logs for a short period of time because Plaintiff had only been allowed to start contacting potential customers within the previous two weeks. (Pl.'s Aff. ¶ 34.) Plaintiff states that Andy Clark never once informed him between September 15, 2011, and November 4, 2011 that he was required to submit daily call logs or that he was being insubordinate because he was not submitting call logs.  (*Id.* ¶ 35.)

Murphy states that, within a short period of Plaintiff being at Scoutware, "it became clear that [Plaintiff] was performing very little work for Scoutware."   (Pl.'s Resp., Ex. 28, Murphy Decl. ¶ 6.)  Murphy adds, in August, 2011, Andy Clark "expressed concern . . . that [Plaintiff] was not setting up demos, and was not sending out emails over [] Contact2." (*Id.* ¶ 7.) Murphy explains that Clark told him that he asked Plaintiff to send daily reports of call activity.  (*Id.* ¶ 8.)  Murphy says that Plaintiff did not comply with Clark's request.  (*Id.* ¶ 9.) Clark stated that he had ongoing verbal conversations with Murphy about Plaintiff's work performance, but that he had no emails or anything in writing reflecting the conversations. (Clark Dep. at 26.)

Plaintiff further alleges that, during his tenure at Scoutware, no one told him to send a specific number of emails through Contact2. (Pl.'s Aff. ¶ 36.)  He also alleges that, during his employment, Scoutware did not allow him to conduct sales demos on his own; rather, others conducted the sales demos that he set up.  (*Id.* ¶ 37.)

Cronin states that, from her experience with Scoutware, Plaintiff should have been able to make fifty or more sales calls per day.  (Cronin Dep. ¶ 5.)  Cronin states Plaintiff's "work performance at Scoutware was very poor."  (*Id.* ¶ 9.)  She adds that he set up very few demonstrations, and that "there was very little evidence that he was engaged in making

6

the calls, sending the c2 messages or emails, and setting up the demons that were required of him. (*Id.* ¶ 10.) She also states that she thought that Plaintiff lacked "initiative in terms of reaching out for help or asking questions, or seeking additional assignments." (*Id.* ¶ 10.) She maintains that she attempted to get Plaintiff to improve his performance. (*Id.* ¶ 11.) Rather than seeing improvement, Cronin explains that she found that Plaintiff performed consistently worse. (*Id.* ¶ 12.)

On September 2, 2011, Plaintiff emailed Lauren Nichols with a list of people he had been contacting. (Pl.'s Resp., Ex. 47.) The thread also shows Plaintiff and Clark emailing about what format Clark wanted the call log in and what exactly Clark wanted. (*Id.*)

On September 14, 2011, Plaintiff gave Cronin an update and they had a discussion about his progress. (Pl.'s Resp., Ex. 45.) She told Plaintiff "nice work," "great" and "good work" throughout the September 14 discussion. (*Id.*)

On September 16, 2011, Plaintiff emailed Cronin with a list of updates. (Pl.'s Resp., Ex. 48.)

Plaintiff adds that he emailed Andy Clark about issues Plaintiff "was having with some customers being hesitant to purchase Scoutware for the upcoming year and asked for [Clark's] advice[.]" (Pl.'s Aff. ¶ 8, citing Pl.'s Ex. 49.) Plaintiff asserts that Clark never addressed his concerns. (*Id.*)

Cronin states that, around September, 2011, she spoke with Clark and told him that she thought that Plaintiff was not working out at Scoutware. (Cronin Dep. ¶ 13.) She stated that, around October 7, 2011, she spoke with Clark about Plaintiff's poor performance and learned that Murphy had decided to terminate Plaintiff's employment. (*Id.* ¶ 14.)

7

Cronin also states that she had issues with Plaintiff's performance.  She stated that she told Andy that she felt that Plaintiff was not working out at Scoutware.  (Cronin Dep. at 33.)  When questioned about why she thought Plaintiff was not working out, she stated that she "perceived a lack of activity in regards to scheduling demos, phone calls and emails . . . [and a] lack of initiative to ask questions of the sales staff, from the seasoned sales staff on process and best practice."  (Cronin Dep. at 34.)

Cronin explained that she was disappointed in Plaintiff's lack of phone calls.  (Cronin Dep. at 34-35.)  She stated that the more phone calls an employee makes the more demonstrations the phone calls would lead to.  (*Id.*)  She noted that she had a problem with Plaintiff making too few phone calls.  (*Id.* at 34.)  She knew of this problem, she stated, because Scoutware had a process by which the employees had to submit their daily phone call reports by email.  (*Id.* at 35.)   She stated that she occasionally submitted phone call logs.  (*Id.*)  But she also stated that the submitting of phone calls was company protocol.  (*Id.*)

Plaintiff has submitted affidavits or evidence that he was performing on par with other Scoutware employees.  Plaintiff also asserts that he was a good employee who responded "almost immediately" anytime that a Scoutware employee contacted him by phone, email or Skype.  (Pl.'s Aff. ¶ 31.)   Plaintiff maintains that Scoutware never gave him a performance review during the course of his employment and never warned him that his performance was not meeting Scoutware's standards. (*Id.* ¶¶ 32, 33.)

Plaintiff states that, in October, 2011, he was focused on making calls to prospective customers in his territory and updating the contacts in Contact2 so that he could start up an email campaign.  (Pl's Aff. ¶ 45.)  On October 24, 2011, Plaintiff sent the first list of

8

emails to customers in his territory.  (*Id.* ¶ 46.)  Plaintiff explains that he planned his email method to be a bi-weekly campaign to customers in his territory. (*Id.*)  Plaintiff represents that, before Scoutware terminated him on November 4, 2011, he was working on his next group of emails to send out to customers for November 7, 2011.  (*Id.* ¶ 47.)

Plaintiff says that, had anyone asked him about his email campaign, he would have provided it to them, but no one did.  (Pl.'s Aff. ¶ 48.)

While working at Defendant, Plaintiff asserts that he made the majority of his phone calls through his computer, using Skype or Google Phone.  (Pl.'s Aff. ¶ 40.) He adds that he made some phone calls using his cell phone.  (*Id.*)  But he also adds that he does not remember which source he used to make all the calls, because Scoutware ended his employment almost two years ago. (*Id.* ¶ 41.)  Plaintiff states that Scoutware never asked for his cell phone records, and if it had, he would have provided them.  (*Id.* ¶ 42.) Scoutware, in fact, Plaintiff claims, never asked for proof of the calls he made during his employment. (*Id.* ¶ 43.)    Plaintiff alleges that Andy Clark, in August, 2011, told him that he preferred that Plaintiff contact customers primarily by telephone. (*Id.* ¶ 44.)

Murphy noted that Plaintiff had not earned the ability to conduct a demo by himself by the time Scoutware terminated him. (Murphy Dep. at 33.)  Murphy stated that he did not have personal knowledge as to how many demonstrations Plaintiff set up, or how many phone calls he made. (*Id.* at 33.)    Murphy did state that he might have seen the number of emails that Plaintiff sent out, but he did not remember.  (*Id.* at 34.)  He did mention that he reviewed one of Plaintiffs's email, which he found "mortifying" because he thought it was "poorly constructed," and Plaintiff did not receive input from anyone from Scoutware.  (*Id.*) Murphy never "communicated" his thoughts to anyone at Scoutware; rather, he received

9

complaints about the email from other employees.  (*Id.*)

The email that Plaintiff sent does contain different fonts, and does contain an "its" instead of an "it's."  (Pl.'s Resp., Ex. 26.)  Plaintiff has submitted other Scoutware employee emails with the same 'issues.'  (Pl.'s Resp., Ex. 26.)  Several emails contain different fonts and one email has an "interesting" instead of an "interested."  (Pl.'s Rep., Ex. 27.)

Murphy acknowledged that Scoutware did not require employees other than Plaintiff to send daily reports. (Murphy Dep. at 29.)  Clark testified that Scoutware never requested daily phone logs from salespeople other than Plaintiff.  (Pl.'s Resp., Ex. 17, Andy Clark Dep. at 11.)

Plaintiff stated that no one ever told him to make a certain number of calls per day. (Pl.'s Dep. at 146.)  Plaintiff admitted that he had forgotten to send daily updates on a handful of days, including September 2, 8, 9, 12, 13, and 14, 2011.  (*Id.* at 303.)

Clark could not recall how many demonstrations other Scoutware salespersons set up per week.  (Clark Dep. at 14-15.)  But he did recall that Plaintiff set up a "negligible" amount, maybe "three or four."  (*Id.* at 15.)

Clark explained that a key to Scoutware finding Plaintiff's performance wanting was that Plaintiff communicated very little through Contact2.  (Clark Dep. at 25.)  But Clark further explained that he was more results oriented, so the fact that other salespeople had similarly low Contact2 numbers was not indicative of their poor performance, because those salespeople may have had better results.  (*Id.*)

Plaintiff has compiled comparison exhibits to show how, even the more experienced Scoutware employees, those who had been there longer than him, did not meet the expected call and demonstration requirements.

10

Plaintiff has submitted an exhibit of Cronin's call logs.  (Pl.'s Resp., Ex. 23.)  The call logs show that, from July 15, 2011 to November 4, 2011, she only twice made between fifty to sixty calls per day, although she often made more than twenty, thirty, and forty calls per day on various occasions as well as less than twenty on various occasions.  (*Id.*)  Plaintiff has also submitted Amanda Carmichael's call logs.  (Pl.'s Resp., Ex. 24.)  She never once made over fifty calls and only four times made over forty calls in the same time period.  (*Id.*)

Defendant has submitted Kevin Reidy's declaration to refute several of Plaintiff's arguments.  (Def.'s Mot., Ex. G, Reidy Decl.)  Reidy explains how Plaintiff's emails and call logs fell short of Scoutware's expectations.  (*Id.*)  Reidy also points out that the records show that Plaintiff did not call all those schools that he allegedly said he had called.  (*Id.*)

Plaintiff has submitted an exhibit that shows that Scoutware gave Plaintiff permission to call potential customers around August 8, 2011, and that, in total, Scoutware allowed Plaintiff to call customers for eight weeks.  (Pl.'s Resp., Ex. 38.)  During that time, "Chris" gave the highest number of demonstrations, nineteen, in forty days.  (*Id.*) After him, Cronin gave eight demonstrations in forty days; "Wes" also gave eight demonstrations in forty days, "Erica," two, and Amanda, zero.  (*Id.*)

Clark stated that Plaintiff set up only four or five demonstrations during his time at Scoutware, a number, Clark maintained, was "woefully inadequate."  (Clark Dep. ¶ 39.)

Plaintiff states that he sent out 58 emails in October, 2011.  (Pl.'s Resp., Ex. 55.)  He has submitted a comparison table to show how many emails Amanda Carmicheal and Cronin sent out during various months at Scoutware.  (*Id.*)

Amanda Carmichael, for the months spanning February, 2011 to October, 2012, sent out the following number of monthly emails: 12, 10, 7, 3, 3, 2, 1, 13, 1, 9, 17, 11, 15, 2, 4,

11

13, and 12. (Pl.'s Resp.,Ex. 55.) In October, 2011, she sent out one email. (*Id.*) From April to June, 2011, she sent 37, 39, and 13 emails. (*Id.*) In October, 2011, she sent out 28 emails. (*Id.*) In December, 2011, she sent out one email. (*Id.*) And in January and March, 2012, she sent out 12 and two emails. (*Id.*)

On November 3, 2011, Cronin messaged Plaintiff and asked him if he wanted to participate in a demonstration with her. (Pl.'s Resp., Ex. 39.) She also stated that she was working on setting up a few more demonstrations for the following week, "after a few slow weeks." (*Id.*) Plaintiff responded "sure," and then told her that he would speak with a potential client and get the demonstration set up for Wednesday or Thursday of that week. (*Id.*) A day later, Scoutware terminated Plaintiff.

### C. October 18, 2011: Plaintiff hands over his Scoutware contract during his Fast Model deposition; Fast Model representative, Ross Comerford contacts Scoutware represented Kate Cronin

On October 18, 2011, Plaintiff gave a deposition in his Fast Model suit. During that deposition, Plaintiff gave his Scoutware contract to Fast Model's attorney, Lee Silver. Plaintiff submits the following timeline to show how a temporal connection exists between handing over the Scoutware contract and his termination from Scoutware. Plaintiff puts forth this timeline to show that Ross Comerford, a Fast Model employee, called Cronin and told her about the Fast Model suit and the underlying allegations. After Comerford and Cronin spoke, Cronin then talked with and texted Clark and Murphy.

- October 18, 2011:

  - 10:00 a.m.: Plaintiff gives his Scoutware contract to Lee Silver during his deposition for the Fast Model litigation;

  - 5:00 p.m: Plaintiff finishes his deposition.

12

- October 19, 2011:

  - 2:00 p.m.: Comerford attempts to call Cronin four times in four minutes;

  - 2:09 p.m.: Cronin calls Comerford back;

  - 3:55 p.m.: Cronin calls Comerford and talks with him for 12:28;

  - 4:09 p.m.: Cronin calls Clark and talks with him for 4:31;

  - 4:14 p.m.: Cronin calls Murphy and talks to him for 10:44.

- October 20, 2011:

  - 11:48 a.m.: Cronin texts Comerford;

  - 12:32 p.m: Cronin texts Murphy;

  - 12:35 p.m.: Comerford texts Cronin;

  - 12:54 p.m.: Cronin texts Comerford;

  - 2:09 p.m: Cronin texts Murphy.

- October 22, 2011:

  - 8:59 a.m.: Cronin texts Murphy;

  - 8:59 a.m.: Cronin texts Comerford;

  - 3:41p.m.: Comerford texts Cronin.

- November 3, 2011:

  - 8:32 a.m.: Murphy calls Cronin and talks to her for 45:45;

  - 9 texts messages back and forth between Cronin and Murphy.

- November 4, 2011:

  - 11:04-11:30 a.m.: Murphy terminates Plaintiff;

  - 11:32 a.m.: Murphy texts Cronin;

  - 11:56 a.m.: Cronin texts Murphy.

13

Cronin testified that she and Comerford are contacts. (Pl.'s Resp., Ex. 3, Cronin Dep. at 8.) She said that she met him in the sports industry, in 2006, when she was a women's basketball coach in Vermont. (*Id.*) She explained that he was a contact whom she trusted. (*Id.*) Cronin admitted that she spoke with Lee Silver, Comerford's attorney in the Fast Model suit about Plaintiff. (Cronin Dep. at 23.)

During the Cronin/Comerford discussion, Cronin stated that she said to Comerford, "I wish I would have talked to you before we hired [Plaintiff.]" (Cronin Dep. at 66.) But Cronin maintained that she was not involved in hiring Plaintiff. (*Id.*) Cronin stated that she told Clark and Murphy about the Comerford discussion. (Murphy Dep. at 67.)

Cronin stated that she shared the Comerford comment that "things did not end well" with Plaintiff at Fast Model. (Cronin Dep. at 83.) Cronin could not recall whether she followed up the conversation with any type of written communication. (*Id.* at 84.) She also could not explain why she did not have, and could not state why she did not have, five text messages that she sent back and forth to Comerford during the relevant time period. (*Id.*)

Plaintiff has identified five missing text messages between Cronin and Comerford that occurred on October 20, 2011. (Pl.'s Resp., Ex. 12.)

Cronin denies that her conversation with Comerford had any impact on the decision to terminate Plaintiff, for Murphy had already made the decision to terminate Plaintiff. (Cronin Dep. ¶¶ 23, 24.) She adds that she did not know Plaintiff was suing Fast Model and that she did not tell Clark or Murphy that Plaintiff was suing Fast Model. (*Id.* ¶¶ 26, 27.)

Murphy stated that he first learned about the Fast Model suit in December, 2011, or after. (Murphy's Dep. at 10.)

### D. The allegations surrounding the New Orleans trip

14

Defendant points to Plaintiff's alleged actions and comments that occurred on a trip to New Orleans, on October 21, 2011, as a reason for terminating him.  Again, the parties disagree as to what really happened in New Orleans.

Murphy recollects that he invited Plaintiff to the New Orleans trip in late September, 2011.  (Murphy Decl. ¶ 10.)  While in New Orleans, Murphy recounts that Plaintiff said he wanted "vagina" in his face, and that the group should go to a strip club.  (*Id.* ¶ 11.)  Murphy states that he thought Plaintiff's behavior was inappropriate and showed poor judgment.  (*Id.*  ¶ 12.)

Plaintiff maintains, before leaving for New Orleans, that Cronin "warned" him that the other employees with whom he was going "would try to keep [him] out late and encourage [him] to do shots of alcohol."  (Pl.'s Aff. ¶ 9.)

Plaintiff states that, on the night of the alleged inappropriate comment, October, 21, 2011, he suggested that he and his companions "go back to the hotel after dinner" because they had a to get up early the next morning.  (Pl.'s Aff. ¶ 10.)  Plaintiff states Jeff Murphy "insisted" that they all stay out on Bourbon Street.  (*Id.*)

Neither during nor after the trip, Plaintiff maintains, did Jeff Murphy mention anything to him about acting inappropriately or saying anything inappropriate.  (Pl.'s Aff. ¶ 11.)  Plaintiff states that he "would have never said" "I want vagina in my face" in front of co-workers or Scoutware customers.  (*Id.* ¶ 12.)  Plaintiff says that the first time he heard that he made this comment was in his deposition in the Fast Model lawsuit on August 24, 2012, when Fast Model's lawyer made the allegation.  (*Id.* ¶ 13.)

During the New Orleans trip, Plaintiff states that he told Jeff Murphy that he was disappointed that some of the schools that Plaintiff had set up sales demos with had not

15

decided to go with the Scoutware product yet.  (Pl.'s Aff. ¶ 14.)  Plaintiffs maintains that Jeff Murphy told him not to worry because Plaintiff was doing "great" and that Murphy was "bringing [Plaintiff] along slowly."  (*Id.*)

Murphy stated that he had a discussion with Andy Clark about Plaintiff's alleged behavior in New Orleans.  (Murphy Dep. at 58.)  At his deposition, Plaintiff's counsel asked Murphy why he waited six weeks to terminate Plaintiff after he had heard of Plaintiff's alleged conduct in New Orleans.  (*Id.*)  Murphy reasoned that he procrastinated in terminating Plaintiff because terminating someone was an unpleasant thing and Plaintiff was not Murphy's priority.  (*Id.* at 59.)

David Heringer was a client whom Scoutware was entertaining on the New Orleans trip.  (Pl.'s Resp., Ex. 29, Heringer Dep.)  He was with his wife in New Orleans.  He did not remember, or ever hear, anyone, including Plaintiff, say anything inappropriate or act inappropriately.  (*Id.*)

**E. Jeff Murphy terminates Plaintiff**

After the trip, in early October, 2011, Murphy states that he made the decision to terminate Plaintiff.  (Murphy Decl. ¶ 13.)  Murphy explains that he based his decision solely on Plaintiff's lack of performance, "indicated by his lack of demonstrated activity, poor judgment, and his inability or refusal to follow direction."  (*Id.* ¶ 14.)

Sometime in early October, 2011, Murphy states that he told Scoutware's business manager, Kevin Reidy, to stop making payments directly into Plaintiff's bank account, and to instead send him paper checks.  (Murphy Decl. ¶ 16.)

Murphy maintains that he did not know that Plaintiff was suing Fast Model, and that he did not care about the circumstances under which Plaintiff ended his employment with

16

Fast Model.  (Murphy Decl. ¶¶ 18, 19.)  Murphy finally maintains that "Plaintiff failed to perform his duties, and provided no value to Scoutware, and was terminated for cause." (*Id.* ¶ 23.)

On November 4, 2011, Murphy called Plaintiff and terminated him.  (Pl.'s Aff. ¶ 16.) Plaintiff maintains that Murphy told him that Plaintiff's most recent paycheck was on its way and would be Plaintiff's last check.  (*Id.* ¶ 17.)  Plaintiff then maintains that Murphy asked him, "[w]hy didn't you tell me about this lawsuit with your former employer?"  (*Id.* ¶ 18.) Plaintiff states that Murphy refused to reveal who told him about the Fast Model lawsuit. (*Id.* ¶ 19.)  During the conversation, Plaintiff states that Murphy made several statements, such as: "the other sales reps don't think you are a good fit," "we don't need employees like you;" "you aren't the type of employee we're looking for;" [w]e don't need employees like you;" and "I've learned some things about you that don't fit with what we want."  (*Id.* ¶ 20.)

Plaintiff states, in the termination conversation, Murphy first brought up the Fast Model suit, and then made the comments above, and then said that Plaintiff was not performing as Scoutware wanted. (Pl.'s Aff.  ¶ 21.)  Plaintiff asserts that this conversation was the first time that he had ever heard that his performance was not sufficient.  (*Id.* ¶ 22.) The only issue that Murphy said he had with Plaintiff's performance, Plaintiff claims, was that Plaintiff did not sent out enough emails from Contact2 in October, 2011.  (*Id.* ¶ 23.) Plaintiff then refutes various statements that Defendant alleges Murphy mentioned/offered as termination reasons.  Plaintiff denies that Murphy mentioned:

- that Scoutware had made the decision to terminate him at the end of September or beginning of October;

- anything about allegations that [he] said [he] wanted 'vagina in my face' during the

17

business trip in New Orleans;[3]

- that Scoutware was terminating him for insubordination or because Plaintiff failed to follow instructions by providing daily calls logs to the company; and

- that Scoutware was terminating him because he did not send out enough emails from the regular Scoutware email system, that he did not set up enough sales demos, that his emails were sloppy/unprofessional/contained inconsistent fonts/grammatical errors.

(*Id.* ¶¶ 24-30.)

In the Fast Model suit, Murphy submitted a declaration. (Pl.'s Resp., Ex. 15, Murphy Fast Model Decl. ¶ 2.) He stated that he made the decision to terminate Plaintiff based on Plaintiff's "poor work performance, and his poor judgment and unprofessional behavior that [he] witnessed during a business trip in New Orleans[.]" (*Id.* ¶¶ 5, 6.)

Murphy stated Scoutware expected Plaintiff to contact clients and potential clients through the company's Contact2 email platform. (Murphy Fast Model Decl. ¶ 6.) Murphy explained that Plaintiff's email history from August 9, 2011 through November 4, 2011 reflected that Plaintiff only sent one email for the entire month of October, 2011. (*Id.*)

Murphy maintained that he did not terminate Plaintiff because of Plaintiff's previous employment with Fast Model or the lawsuit again Fast Model. (Murphy Fast Model Decl. ¶ 7.) Murphy further stated that he does not recollect ever speaking with Comerford about Plaintiff. (*Id.* ¶ 8.)

---

[3]Murphy stated that he never discussed Plaintiff's conduct in New Orleans with Plaintiff. (Murphy Dep. at 57.) Murphy added that he never talked about Plaintiff's conduct with Plaintiff when he terminated Plaintiff by phone. (*Id.*)

18

Murphy stated that Scoutware did not send Plaintiff a final paycheck until seven months after Defendant terminated Plaintiff because the amount was a "point of contention." (Murphy Dep. at 36-37.) Murphy explained that Defendant and Plaintiff were disputing the amount owed, and Murphy stated that Defendant's accountant calculated the amount and took into account that Plaintiff had not yet returned the company-issued laptop. (*Id.* at 37-38.)

### F. Post-termination facts

On November 10, 2011, Plaintiff sent Murphy an email. (Pl.'s Resp., Ex. 8.) In the email, Plaintiff questioned the amount that Murphy sent him. (*Id.*) Plaintiff also offered to return the laptop, as he had talked about with Murphy "on the phone last week."[4] (*Id.*) And he requested a waiver of the non-compete in the agreement. (*Id.*) The parties discussed other topics, as well, including Plaintiff's suspicions about being fired for his lawsuit against Fast Model. (*Id.*)

Plaintiff states that he attempted to contact Murphy several times after Murphy terminated him, to talk about the owed wages and the details about shipping back the laptop. (Pl.'s Aff. ¶ 49.) Plaintiff alleges that Murphy never responded to Plaintiff's emails. (*Id.* ¶ 50.) After Scoutware terminated him, Plaintiff states that the laptop crashed and he stopped using it. (*Id.* ¶ 51.)

Plaintiff has submitted the following post-termination timeline to show that Scoutware and Fast Model were in contact even after Scoutware terminated Plaintiff. On or around

---

[4]On November 18, 2011, Plaintiff sent Murphy an email. (Pl.'s Resp., Ex. 32.) In the email, Plaintiff said he "would be happy to send back the laptop." (*Id.*) He did say, though, that he had thought that Murphy was going to send "extra" money as a severance in his last check, which was also supposed to include money to ship back the laptop. (*Id.*)

19

December 3, 2011, Plaintiff's counsel notified Lee Silver that Scoutware terminated Plaintiff.

- December 5, 2011:

  - 6:34 p.m.: Comerford calls Cronin and talks with her for 19:59;

  - 7:02 p.m.: Comerford texts Cronin;

  - 7:05 p.m.: Cronin texts Comerford;

  - 7:44 p.m.: Comerford texts Cronin;

  - 7:50 p.m.: Cronin texts Comerford.

- December 9, 2011:

  - 12:12 p.m.: Cronin texts Comerford.

- December 15, 2011:

  - 10 texts between Comerford and Cronin and one 4:50 conversation.

On November 18, 2011, Plaintiff sent Murphy an email.  (Pl.'s Resp., Ex. 32.)  In the email, Plaintiff said he "would be happy to send back the laptop."  (*Id.*)  He did say, though, that he had thought that Murphy was going to send "extra" money as a severance in his last check, which was also supposed to include money to ship back the laptop.  (*Id.*)

In the December 15, 2011 text thread, Cronin stated, "[Plaintiff] just called me and left a [voicemail.] Said he heard your deposition and eluded to "it's in your best interest to call me back". WTF? Am I wrapped up in this now?"  (Pl.'s Resp., Ex. 9.)   Comerford responded, "[j]ust talked to my attorney. He said you have nothing to worry about."  (*Id.*)

In January and February, 2012, Comerford texted Cronin Lee Silver's email address and asked Cronin if she had talked to Silver.  (Pl.'s Resp., Ex. 34.)

On June 21, 2012, Defendant sent Plaintiff a check for $785.97.  (Pl.'s Resp., Ex. 16.)

**II.   Summary judgment standard**

20

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more

21

than simply show that there is some metaphysical doubt as to the material facts."
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately
a district court must determine whether the record as a whole presents a genuine issue of
material fact, drawing "all justifiable inferences in the light most favorable to the non-moving
party."  *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Analysis

Plaintiff alleges that Defendant violated the WPA when it terminated him, at least in
part, because of his suit against Fast Model and that Defendant breached their employment
agreement because it did not give Plaintiff two weeks' worth of notice before it terminated
him and the agreement does not define what is "cause."

The Court finds that genuine issues of fact exist to survive summary judgment.
Viewing the facts in a light most favorable to Plaintiff, he has put before direct and
circumstantial evidence that Defendant and its representative factored his Fast Model suit
into his termination.  Because the employment agreement does not define "cause," an
issue of fact also exists as to whether Defendant had a right to terminate Plaintiff without
giving him the agreement-provided for two weeks' notice.

### 1.  The Whistleblowers' Protection Act

Under the Whistleblowers' Protection Act ("WPA"):

> An employer shall not discharge, threaten, or otherwise discriminate against
> an employee regarding the employee's compensation, terms, conditions,
> location, or privileges of employment because the employee . . . reports . .
> . a violation or a suspected violation of a law or regulation or rule
> promulgated pursuant to law of this state[.]

Mich. Comp. Laws § 15.362. To state a prima facie case of retaliation under the WPA, a plaintiff must show: (1) he was engaged in protected activity as defined by the act; (2) he was discharged or discriminated against; and (3) a causal connection exists between the protected activity and the discharge or adverse employment action. *West v. Gen. Motors Corp.*, 655 N.W.2d 468, 471-72 (Mich. 2003). A burden-shifting analysis applies to claims brought pursuant to the WPA.

> It is a burden of proof analysis. Under it, plaintiff has the burden of proving that he was engaged in protected conduct and that his participation in that conduct was a motivating factor in the decision to terminate him. The burden then shifts to the employer to come forward with evidence demonstrating that plaintiff's termination was for a legitimate reason. If the employer states a legitimate reason, the employee may still prevail if he demonstrates that the reason was mere pretext for his dismissal.

*Eckstein v. Kuhn*, 408 N.W.2d. 131, 134 (Mich. Ct. App. 1987); *see also Taylor v. Modern Eng'g, Inc.*, 653 N.W.2d 625, 629 (Mich.Ct.App. 2002). "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Taylor*, 653 N.W.2d at 629 (citation omitted).

A plaintiff can establish a causal connection with either direct or circumstantial evidence. *Shaw v. Ecorse*, 770 N.W.2d 31, 40 (Mich.Ct.App. 2009). "Direct evidence is that [evidence] which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions." *Id.* (citation omitted). "To establish causation using circumstantial evidence, the 'circumstantial proof must facilitate reasonable inferences of causation, not mere speculation.'" *Id.* (citation omitted). *See Debano-Griffin v. Lake County*, 858 N.W.2d 634 (Mich.2013) (applying the *McDonell*

23

*Douglas* burden shifting framework to a plaintiff's circumstantial evidence WPA claim.).

### a. The Court has already stated that Plaintiff engaged in a protected activity

Under the WPA, protected activity is when the "employee . . . reports . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state."

Defendant argues that Plaintiff cannot succeed on his WPA claim because "there is no evidence that Murphy knew enough about the [Fast Model] lawsuit to know [Plaintiff] was engaged in a 'protected activity' under the WPA. (Def.'s Mot. at 14.) Defendant suggests that Plaintiff has not provided any evidence that suggests that anyone at Scoutware, even if they knew about the Fast Model suit, "would have any idea what the lawsuit was about, or any reason to believe it was anything other than a run-of-the-mill common-law breach of contract claim." (*Id.*)

Defendant points to *Meier v. Detroit Deisel Corp.*, 268009, 2006 WL 2089206 (Mich.Ct.App. July 27, 2006), *appeal den.* 725 N.W.2d 19 (Mich. 2006), to support its claim. There, the plaintiff filed suit against his employer and alleged that his employer terminated him because of the suit. *Meier*, 2006 WL 2089206, at *1. The court held that the plaintiff failed to establish a report of protected activity, "a violation or suspected violation of a law or regulation or rule promulgated pursuant to law[.]" *Id.* The court pointed out that the plaintiff "cited no authority to support the proposition that a lawsuit alleging exclusively common-law claims like defamation, fraud, or invasion of privacy constitutes report of a violation of law." *Id.* The court reasoned that, if it were to read the WPA "so broadly,

24

protected activity would include any dispute between an employer and an employee that resulted in a lawsuit." *Id.* The court stated that "the WPA presumes a public interest in the protected activity, such as reports of violations of civil rights, environmental regulations, and the like. There must be a public element to the matter about which a whistleblower raises an alarm." *Id.* Because the plaintiff did not allege a public element to his claim, the court dismissed it. *See also Tapley v. Wageworks, Inc.*, 09-14182, 2010 WL 2560442 (E.D.Mich. June 15, 2010) (Roberts, J.) (citing *Meier* and holding that the plaintiff's complaint against her employer, that it stole her commissions, was not a matter of public concern, and therefore denying reconsideration and dismissing the case.).

The Court has already addressed this argument in its July 9, 2012 order. (Dkt. 20, July 20 Order at 12.) The Court held that Plaintiff did take part in a protected activity. (*Id.* at 12.) The Court stated,

> [t]here is nothing in the language of the WPA that the protected activity must be a matter of public concern in the way that Defendant[ is] attempting to argue. Further, reporting actual violations to help aggrieved parties and bring light to the violations so that they do not continue to occur is a matter of public concern. The subject matter of the action need not be a public safety issue or something deserving national attention.

(*Id.*)

The Court further notes that Defendant's offered cases are distinguishable. In those cases, the plaintiff was suing his current employer and alleged a WPA claim for actions against that employer. Here, the allegation is that Defendant took an adverse action against Plaintiff because of Plaintiff's suit against a wholly unrelated company. That conduct, the Court finds, is a protected activity under the WPA.

**b.    Plaintiff was terminated**

25

Neither party argues that Plaintiff has not satisfied the second element of a WPA claim.

### c.  In a light most favorable to Plaintiff, he is able to establish causation with direct and circumstantial evidence

Defendant also argues that Plaintiff cannot show a causal connection between his alleged protected activity and Scoutware's terminating him.  (Def.'s Mot. at 14.)

The Court finds that the facts, in a light most favorable to Plaintiff, support both direct and circumstantial evidence proofs of causation.

### i.  Plaintiff has brought forth direct evidence of discrimination

Plaintiff has brought forth direct evidence of a causal connection between Scoutware terminating him and his Fast Model suit.  In the termination conversation on November 4, 2011, Plaintiff has submitted a declaration that Murphy asked him, "[w]hy didn't you tell me about this lawsuit with your former employer?"  Plaintiff states that Murphy refused to reveal who told him about the Fast Model lawsuit.  During the conversation, Plaintiff states that Murphy made several statements, such as: "the other sales reps don't think you are a good fit," "we don't need employees like you;" "you aren't the type of employee we're looking for;" [w]e don't need employees like you;" and "I've learned some things about you that don't fit with what we want."  Given that Murphy questioned Plaintiff about the Fast Model suit in the termination conversation, the Court finds that it need draw no inferences to find that the Fast Model suit was at least a motivating factor in Scoutware's terminating Plaintiff.

### ii.  Plaintiff can also establish a circumstantial evidence case of discrimination against Defendant

26

Again, "[t]o establish causation using circumstantial evidence, the 'circumstantial proof must facilitate reasonable inferences of causation, not mere speculation.'" *Id.* (citation omitted). For a WPA claim, "[a] plaintiff ha[s] to show that his employer took adverse employment action *because of* [a] plaintiff's protected activity[.]" *West v. General Motors Corp.*, 665 N.W.2d 468, 472 (Mich. 2003) (emphasis in *West*.).

Plaintiff points to various pieces of evidence to support his argument that he can even satisfy a circumstantial evidence case. He points to the timing of the phone calls following his Fast Model deposition, the text messages between Cronin and Comerford, and how Defendant appeared to have had different standards of him than others.

The Court finds, looking at these bits of evidence, that enough circumstantial evidence exists for Plaintiff to satisfy a causal connection between his protected activity and his firing.

First, the phone calls and text messages between Comerford and Cronin and Cronin and Murphy are suspicious. These phone calls happened roughly one day after Fast Model received Plaintiff's Scoutware contract and continued on the day Scoutware terminated Plaintiff.

The Court recognizes that "a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action" and that "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation where

27

discrimination-based retaliation is claimed." *West v. General Motors Corp.*, 665 N.W.2d 468, 472-73 (Mich. 2003) (citation omitted).

Here, though, more evidence exists. Plaintiff has submitted the text messages between Cronin and Comerford showing that Cronin talked to Fast Model's attorney. There is also the December 15, 2011 text thread showing that Cronin was worried about whether she would become involved in any litigation. And finally, there is the allegation that Murphy asked Plaintiff about the Fast Model suit in the termination conversation.

In *West,* the court pointed to a case in which a plaintiff could support a claim with a close temporal relationship. *Id.* at 473. In that case, *Henry v. Detroit*, 594 N.W.2d 107 (Mich. 1999), the *West* court noted that the plaintiff had also presented evidence that "his superior expressed clear displeasure with the protected activity engaged in by the plaintiff." *Id.* Given Plaintiff's affidavit, Plaintiff has shown that Murphy was displeased with Plaintiff because of the Fast Model suit.

Plaintiff has established a causal connection with circumstantial evidence.

### ii.   Plaintiff has brought forth evidence that Defendant's legitimate business reasons had no basis in fact, and therefore were pretext

Defendant argues that, even if Plaintiff could establish a prima facie case of discrimination, that it has alleged a legitimate business reason for terminating Plaintiff. (Def.'s Mot. at 15.) Defendant offers that Plaintiff,

- set up only four or five demos with prospective clients in nearly four months of employment;

- stopped communicating with Scoutware in October, 2011;

- sent a negligible number of emails through Contact2;

- refused to follow Clark's explicit instructions regarding daily call updates–sending either insufficient information or (often) nothing at all; and

- failed to make most off the calls reported in the few updates he did provide.

(Def.'s Mot. at 16.)

"There are three ways a plaintiff can establish that a defendant's stated legitimate, nondiscriminatory reasons are pretexts: (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Debano-Griffin*, 828 N.W.2d at 640-641 (citation omitted).

Here, Plaintiff has submitted sufficient evidence, when, viewing the evidence in a light most favorable to him, that shows that the purported legitimate business reasons were pretext. Plaintiff shows the reasons were pretext by pointing out the possibility that the factors could be insufficient to justify the termination decision.

As the Court reviewed in the facts section, Plaintiff has submitted evidence that there is a question whether the alleged actions were sufficient to terminate him. He points out that other employees conducted fewer demonstrations, made fewer calls, and sent fewer emails than he did in the time he was permitted to contact potential clients and set up demonstrations. Plaintiff has also showed that Cronin complimented his progress at various times and that Murphy told him he was doing a good job while in New Orleans.

29

There is also the issue of Plaintiff being a new employee and Cronin stating that Plaintiff "bear" with Scoutware, as there was no manual for employees.

And while Cronin testified that Clark would jump all over Plaintiff if Plaintiff did not use Contact2 or if the Contact2 emails had grammar issues, there is no indication that those missteps are terminable offenses. Cronin's statement evidences that, in fact, other employees had not used Contact2 and had grammar or usage issues in the emails as well, and there is no indication that anyone was terminated for those issues.

Because the Court finds that there are disputed facts as to whether the offered reasons for terminating Plaintiff warranted the termination, the Court finds that Plaintiff can also survive summary judgment on a circumstantial evidence theory.

## B. There is a genuine issue of fact as to what constitutes "cause," rending Defendant the ability to terminate Plaintiff without two weeks' notice

As to the breach of contract claim, Defendant solely argues that "Plaintiff failed to perform the duties required of him under this employment contract, and was therefore terminated for cause." (Def.'s Mot. at 16.)

Plaintiff argus that Defendant admitted not paying Plaintiff the wages he was owed from November 1, 2011 through November 4, 2011. (Pl.'s Resp. at 17.) Plaintiff suggests, therefore that the only issue is the amount owed to Plaintiff. (*Id.*) Plaintiff maintains that the employment agreement does not define what "cause" is, and because the agreement does not, an issue of material fact exists as to whether Defendant needed to give Plaintiff two weeks' worth of notice in order to terminate him. (*Id.*)

The Court agrees with Plaintiff.

In Michigan, employment relationships are generally "terminable at the will of either party." *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998) (citation omitted).  But a party may rebut this presumption and show that "contractual obligations and limitations are imposed on an employer's right to terminate employment.  *Id.* (citation omitted).  A party can rebut the presumption "with proof of either a contract provision for a definite term of employment, or one that forbids discharge absent just cause."  *Id.* at 911 (citation omitted).  Michigan courts have recognized three ways by which a plaintiff can prove such contractual terms: "(1) proof of a 'contractual provision for a definite term of employment or a provision forbidding discharge absent just cause;' (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a 'legitimate expectation' of job security in the employee."  *Id.* (citations omitted).

The following exhaustive quote is the Michigan Supreme Court's language of how to interpret employment contracts that contain termination for "cause" provisions.  The language shows that, where a contract states that an employer can only terminate for cause, and the contract does not contain a definition of cause, a question of fact exists for a jury to determine whether the plaintiff's action did constitute cause for termination.

> Where an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review.  The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work.  A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge.  There must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract.

The role of the jury will differ with each case. Where the employer claims that the employee was discharged for specific misconduct[,] intoxication, dishonesty, insubordination[,] and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he did?

Where an employee is discharged for stated reasons which he contends are not 'good cause' for discharge, the role of the jury is more difficult to resolve. If the jury is permitted to decide whether there was good cause for discharge, there is the danger that it will substitute its judgment for the employer's. If the jurors would not have fired the employee for doing what he admittedly did, or they find he did, the employer may be held liable in damages although the employee was discharged in good faith and the employer's decision was not unreasonable.

While the promise to terminate employment only for cause includes the right to have the employer's decision reviewed, it does not include a right to be discharged only with the concurrence of the communal judgment of the jury. Nevertheless, we have considered and rejected the alternative of instructing the jury that it may not find a breach if it finds the employer's decision to discharge the employee was not unreasonable under the circumstances.

Where the employee has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or not to be unreasonable. An instruction which permits the jury to review only for reasonableness inadequately enforces that promise.

In additional to deciding questions of fact and determining the employer's true motive for discharge, the jury should, where such a promise was made, decide whether the reason for discharge amounts to good cause: is it he kind of thing that justifies terminating the employment relationship? Does it demonstrate that the employee was no longer doing the job?

An employer who agrees to discharge only for cause need not lower its standard of performance. It has promised employment only so long as the employee does the job required by the employment contract. The employer's

standard of job performance can be made part of the contract. Breach of the employer's uniformly applied rules is a breach of the contract and cause for discharge. In such a case, the question for the jury is whether the employer actually had a rule or policy and whether the employee was discharged for violating it.

An employer who only selectively enforces rules or policies may not rely on the principle that a breach of a rule is a breach of the contract, there being in practice no real rule. An employee discharged for violating a selectively enforced rule or policy would be permitted to have the jury access [sic] whether his violation of the rule or policy amounted to good cause. Rules and policies uniformly applied are, however, as much a part of the "common law of the job" and a part of the employment contract as a promise to discharge only for cause.

Additionally, the employer can avoid the perils of jury assessment by providing for an alternative method of dispute resolution. A written agreement for a definite or indefinite term to discharge only for cause could, for example, provide for binding arbitration on the issues of cause and damages.

*Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 895-97 (Mich. 1980).

Here, the employment agreement contains a "cause" provision and does not define what constitutes cause for immediate termination. The jury is therefore entitled to determine whether Defendant's alleged reasons for terminating Plaintiff were actually for "cause" or whether Defendant had to give two weeks' notice before it terminated him.

Defendant points to *Harrison v. Camou Pico. Inc.*, 283635, 2009 WL 1139320 (Mich.Ct.App. Apr. 28, 2009) to supports its argument that breach of the contract is "cause." But there, the contract specifically defined "cause" as the failure to substantially perform the plaintiff's primary duties and obligations to his employer, the defendant. *Harrison*, 2009 WL 1139320 at *2. The Court finds *Harrison* unpersuasive.

33

The Court therefore DENIES Defendant's motion for summary judgment on Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

## IV.    Conclusion

For the above-stated reasons, the Court DENIES Defendant's motion for summary judgment.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 31, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 31, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer